# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs November 13, 2013

## STATE OF TENNESSEE v. TORRIANO FLOYD

**Appeal from the Criminal Court for Shelby County**
No. 10-04996      W. Mark Ward, Judge

---

**No. W2013-00323-CCA-R3-CD  - Filed December 3, 2013**

---

Appellant, Torriano Floyd, was convicted of two counts of robbery and one count of attempted robbery.  The trial court imposed two six-year sentences for robbery, to be served consecutively to each other, and one four-year sentence for attempted robbery, to be served concurrently, for an effective sentence of twelve years in the Tennessee Department of Correction.  In this appeal, he challenges the credibility of one of the witnesses as it pertains to sufficiency of the evidence and the imposition of partial consecutive sentence alignment. Discerning no error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT W. WEDEMEYER, JJ., joined.

Paul K. Guibao (on appeal) and Larry E. Copeland, Jr. (at trial), Memphis, Tennessee, for appellant, Torriano Floyd.

Robert E. Cooper, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; Amy P. Weirich, District Attorney General; and Meghan Fowler and Josh Corman, Assistant District Attorneys General, for appellee, State of Tennessee.

## OPINION

### I.  Facts

### A.  Facts from Trial

This case involves crimes against Charles Albright, Kenneth Smith, and Thomas Brown that occurred in the early morning hours of December 14, 2009, at a Mapco station

on Winchester Road in Memphis, Tennessee. The grand jury returned indictments against appellant for the aggravated robbery of Charles Albright, the aggravated robbery of Kenneth Smith, and the attempted aggravated robbery of Thomas Brown. The trial of the matter began on September 17, 2012.

The State's first witness, Anthony Heard, testified that he was sixteen years old when he was involved in the robbery in this case and that he pleaded guilty in juvenile court to his participation. At the time of trial, he had served eight months in State custody and had been released from confinement.

Mr. Heard stated that he was with his cousin Quincy Askew in December 2009 and met appellant, whom he knew as "T. Floyd," through him. On December 13, 2009, Mr. Heard and Mr. Askew made plans to go to Club Visions together that evening. After Mr. Askew picked up Mr. Heard, they stopped to pick up friends of Mr. Askew, namely appellant and "some tall guy." When they arrived at the club, a police officer in the parking lot asked to see everyone's identification. Because no one in the car possessed a driver's license, the officer demanded that they leave the premises. Mr. Heard did not see appellant or the other male in possession of weapons when they first entered the car, but when they were in the parking lot of the club, he saw that they had weapons in the back seat of the car.

Mr. Heard recalled that Mr. Askew began to drive down Winchester Road toward his home. Along the way, someone in the vehicle "pointed out a . . . car with rims." The car was parked at a Mapco station, so Mr. Askew pulled the car into the station's parking lot and stopped toward the rear of the lot. At that point, everyone in the vehicle switched seats. Mr. Heard assumed the driver's seat position, Mr. Askew sat in the back seat, and appellant sat in the front passenger's seat. Mr. Heard had been asked to drive. After they changed seats, Mr. Heard pulled up alongside a gas pump. The car with the "rims" was parked some distance away, and the passengers instructed Mr. Heard to drive toward it. When they reached the car, the passengers in the back seat "hopped" out, followed shortly by appellant. Mr. Heard remained seated in the car. The three men soon "hopped back in" and told Mr. Heard to "go." Mr. Heard did not see what had happened at the other car because the windows had become foggy. Mr. Heard began to drive away, and the passengers in the other car followed them, then fired a weapon in their direction. Mr. Heard swerved the vehicle into the curb, and the passengers exited the car and began running. Mr. Askew and the "tall guy" began throwing things as they ran.

Mr. Heard acknowledged that he did not want to testify at trial because he was "from the streets" and did not want to identify anyone. He speculated that when Mr. Askew was identified, Mr. Askew implicated him because "they [were] trying to put it all on [him] . . . [b]ecause he was a juvenile at the time."

On cross-examination, Mr. Heard acknowledged that the officer who turned them away from Club Visions was, indeed, an officer with the Memphis Police Department. He knew that it was illegal to operate a vehicle without a valid driver's license and stated that the officer nonetheless allowed them to leave the premises. He clarified that the officer directed his flashlight at each passenger and that the weapons were tucked under the seats on the floorboard at that time. He maintained that the weapons belonged to appellant and the other male and that Mr. Askew did not have any weapons in his vehicle prior to picking them up. Mr. Heard confirmed that the weapons used were a .45 caliber and a "tech nine." He said that when appellant exited the vehicle, he did not have a weapon and that only the back seat passengers were armed. Mr. Heard explained that when they exited the car after he ran into the curb, they ran through a field and into some woods.

The State's next witness was Officer Ronald Towns with the Memphis Police Department. He was dispatched to the robbery crime scene and ordered that Mr. Askew's vehicle be towed. He said that the vehicle was a 1992 Buick LaSabre and that it was located on Winchester Road. Officer Towns noted damage to the right rear door, a cracked windshield, and damage to the front grill. Nonetheless, he believed it to be operable.

Sergeant Marlon Wright with the Memphis Police Department testified next and stated that he was assigned to the crime scene investigation unit in December 2009. He was involved in processing the Buick LaSabre that had been occupied by Mr. Askew, Mr. Heard, appellant, and the other male. During the search, officers recovered a Motorola cellular telephone, a black wallet, one Tennessee identification card, a door key, a Regions Bank debit card, and latex gloves. Through Sergeant Wright, the State introduced all of the aforementioned evidence, as well as photographs of the vehicle.

The State's next witness was Thomas Brown, the victim of the attempted aggravated robbery and a cousin of the victim Charles Albright. Mr. Brown and Mr. Albright had also planned to go to Club Visions on the night of December 13, 2009, and Mr. Albright drove his white Grand Marquis. Before going to the club, they stopped at a Mapco station. Mr. Brown described his cousin's car as having twenty-four-inch chrome rims on the wheels. Mr. Albright stopped at the gasoline pump to fill up his tank, and Mr. Brown and Mr. Smith went to the window of the store to purchase some items. Because of the hour, the doors to the store were locked. Mr. Albright and Mr. Smith had already left the store and were beside their vehicle waiting for Mr. Brown, who was still at the gas station window. From the window, Mr. Brown could see two or three men standing outside of Mr. Albright's car. Mr. Albright was standing up, and one perpetrator was "holding him" while a second perpetrator searched his pockets. Mr. Smith was lying on the ground, and a third perpetrator held a gun to his face and ordered him to "give all his stuff up." He described the three perpetrators as all being African-American, with one having a light complexion and the other two having

dark complexions. Mr. Brown recalled seeing a large "M-16 type" weapon that would require the shooter to hold with two hands. From his vantage point, Mr. Brown could observe that the man holding the large weapon demanded that Mr. Smith remove everything he was wearing. That man took Mr. Smith's "chains," his telephone, wallet, and all of his other possessions.

In the meantime, Mr. Brown tapped lightly on the window of the Mapco station, trying to get the clerk's attention so he could call the police. Mr. Brown stated that he must have tapped too loudly and instead attracted the attention of one of the perpetrators, who pointed the gun at him and ordered him to walk toward the vehicles. Mr. Brown, reluctant to walk toward the weapon, stood with his hands in the air, saying, "I ain't got nothing [sic]." The three men then jumped into their vehicle and fled the scene. Mr. Brown, Mr. Albright, and Mr. Smith then gave chase, and occupants of the perpetrators' vehicle began firing shots in the air. The vehicle then came to a rest, and the occupants exited and began to run across a parking lot. One of the men dropped a telephone as he was running, and Mr. Albright retrieved it. He denied that anyone in their vehicle fired a weapon.

The State showed Mr. Brown the telephone and asked if he recognized it. He answered affirmatively and said that he had looked at photographs and text messages on the telephone. In one of the photographs, he saw a man whom he recognized as the man who had restrained or "braced" Mr. Albright during the robbery. He also viewed text messages that discussed robbing people. At trial, he identified Anthony Heard as the person who had held Mr. Albright during the robbery. The State also played a DVD of the Mapco's video surveillance footage detailing the robbery, which Mr. Brown narrated.

The State called another one of the victims, Charles Albright, as its next witness. Mr. Albright testified that he lived in Mississippi in December 2009 and that he drove to Memphis with Thomas Brown and Kenneth Smith to visit Club Visions on the night in question. They stopped at a Mapco Station on Winchester Road at Kirby Parkway to fill up his car with gasoline. All three passengers exited the vehicle, and Mr. Albright pumped the gasoline while the other passengers walked up to the store's window. After pumping the gasoline, Mr. Albright walked to the store's window to purchase some chewing gum. He and Mr. Smith had walked approximately half the distance back to his vehicle when a white Buick pulled up. They had almost reached his vehicle when three men wearing black "hoodies" exited the Buick and instructed them not to move. Mr. Albright stated that at first, he thought it was a joke, so he and Mr. Smith continued walking toward the vehicle. However, the front passenger jumped out of the Buick wielding a large firearm, so he stopped walking immediately. The men forced Mr. Smith to the ground, where he was instructed to remove his jewelry and empty his pockets. One of the other passengers

-4-

approached Mr. Albright, instructed him not to move, and "braced" him. Mr. Albright identified Anthony Heard as the perpetrator who "braced" him during the robbery.

Mr. Albright recalled that after Mr. Smith threw his property to the ground, appellant picked it up and placed it in his pocket. Appellant then approached Mr. Albright and emptied his pockets, removing all of his personal property. Mr. Brown was still standing at the window of the Mapco station, and the man holding the gun pointed it toward Mr. Brown and told him to approach. When Mr. Brown did not comply, all of the perpetrators fled the scene in their vehicle. The three victims entered their vehicle and followed the perpetrators in an attempt to obtain a license plate number.

Mr. Albright testified that as they followed the Buick down Winchester Road, gunshots were fired from the Buick. The Buick then stopped alongside the curb, but partially within the lane of traffic, in front of New Direction Church. Mr. Albright continued driving to the McDonald's parking lot. From that vantage point, he could see four individuals exit the Buick and run through the parking lot of the church. He walked toward the car to see if he could find anything. He picked up a cellular telephone and subsequently turned it over to the police. However, before turning it in, he looked through the contents of the telephone and saw pictures of Anthony Heard.

As Mr. Albright returned to his vehicle, police officers arrived and surrounded his vehicle, stating that they had received a call about a robbery and maintaining that the occupants of Mr. Albright's vehicle were suspects. He clarified the situation with the officers, and his vehicle was searched. Officers found no weapons. Later in the investigation, Mr. Albright was shown an array of photographs from which he identified appellant as one of the perpetrators.

On cross-examination, Mr. Albright confirmed that appellant did not possess a weapon during the robbery. He clarified that the person who emerged from the Buick was a tall man with "dreads" and that he was not present in the courtroom during the trial. The person who "braced" or "barred" him, Anthony Heard, and appellant exited from the back seat. Mr. Albright reiterated that he lost his wallet, telephone, and money in the robbery. Mr. Albright stated that when the robbery began, Mr. Heard approached him first and "braced" him.

The State called Detective Jennifer Robinson with the Memphis Police Department as its next witness. She was assigned to the robbery bureau in 2009 and investigated the instant case. During the course of her investigation, she took possession of a cellular telephone from Charles Albright and placed it into evidence.

Detective Stan Ivey with the Memphis Police Department was the State's next witness. He, too, was assigned to the robbery bureau in 2009 and was involved in the investigation of the instant case. His first contact with Mr. Albright and Mr. Brown was in January 2010. Fingerprints taken from the Buick used during the robbery matched those of Quincy Askew, so he proceeded to his home to interview him. He met with Verna Askew, Mr. Askew's mother, and showed her a photograph that had been taken with the cellular telephone that was in evidence. She identified the subject in the photograph as her younger cousin Anthony Heard.

Detective Ivey later spoke with Mr. Askew by telephone, who stated that he had loaned his vehicle to appellant and his younger cousin Anthony Cover on the night in question. Detective Ivey subsequently met with Mr. Heard after he was detained at his school and transported to the robbery office. Mr. Heard admitted his participation in the robbery and implicated appellant and his cousin, Mr. Askew. He also noted the involvement of another male whose name he did not know. Mr. Heard told Detective Ivey that they took "a couple of cell phones and a couple of wallets" during the robbery.

Detective Ivey stated that the next step in his investigation was to prepare three separate photograph lineups containing photographs of appellant, Mr. Askew, and Mr. Heard. He presented them to Mr. Brown and Mr. Albright. Mr. Brown identified Mr. Heard only, while Mr. Albright identified appellant only. Neither victim could identify Mr. Askew. Detective Ivey had no evidence to corroborate Mr. Heard's statement that Mr. Askew was present during and involved in the robbery.

On cross-examination, Detective Ivey noted that a .380 caliber pistol was recovered from the Buick after it was towed. Officers also removed wallets, a cellular telephone, and an identification card from the vehicle. He clarified that Mr. Heard, in his statement, claimed that the occupants of Mr. Albright's car had fired gunshots and shot the Buick's tires. After Detective Ivey's testimony, the State rested its case-in-chief.

Appellant testified on his own behalf. He denied being present at Mapco on December 14, 2009, and denied having ever seen Mr. Albright or Mr. Brown before trial. He acknowledged that he knew Mr. Askew and was "familiar with" Mr. Heard but not to the degree of "being around them." Appellant stated that Mr. Heard looked like one of the people who shot him during a robbery in which he was a victim but that he was not with Mr. Heard during the robbery on December 14. He further explained that he knew Mr. Askew through a common acquaintance with a female and that Mr. Askew "was the reason that they robbed [him], why they shot [him]" the week before Christmas in 2009. He claimed that the reason Mr. Askew and Mr. Heard implicated him in the robbery in the instant case was because he had a conflict with Mr. Askew. Appellant admitted that he had been charged as

a juvenile with first degree murder, that he was transferred to criminal court, and that he subsequently pleaded guilty to voluntary manslaughter and received a three-year sentence.

Appellant's last witness was Terre Fratesi, a prosecutor with the Shelby County District Attorney General's Office. She was involved in the juvenile court proceedings against Anthony Heard. She testified that she recommended to the juvenile court that Mr. Heard's case be handled in that court because he did not have a "concerning" prior juvenile record, he had given a statement to police admitting his involvement, he had provided the names of two other suspects, and he had assisted the police in their investigation by providing helpful information. In addition, none of the victims appeared in juvenile court for the hearing. She was also familiar with appellant and Mr. Askew from her dealings with them in juvenile court.

Upon the proof presented, the jury found appellant guilty of the lesser-included offenses of two counts of robbery and one count of attempted robbery.

### B. Facts from Sentencing

At the November 29, 2012 sentencing hearing, neither party presented witnesses. The parties agreed that appellant would be sentenced as a Range I offender. The State advanced the following enhancing factors: (1) that appellant had a previous history of criminal convictions or criminal behavior beyond those necessary to establish the appropriate range of punishment; (2) that the offense involved more than one victim; and (3) that appellant had no hesitation about committing a crime when the risk to human life was high. Tenn. Code Ann. § 40-35-114(1), (3), (10). The trial court requested argument with regard to the following additional factors: (1) appellant possessed or employed a firearm during the commission of the offense; and (2) the felony resulted in death or serious bodily injury or involved the threat of death or serious bodily injury to another person after appellant had been previously convicted of a felony that resulted in death or serious bodily injury. *Id.* § 40-35-114(9), (11).

Appellant argued that the following mitigating factors should apply: (1) that appellant neither caused nor threatened serious bodily injury; (2) that appellant played a minor role in the commission of the offenses; (3) that appellant lacked substantial judgment in committing the offense because of youth; and (4) under the "catch-all" provision, that appellant was disadvantaged because of his social environment. *Id.* § 40-35-113(1), (4), (6), (13).

The State asked for consecutive sentencing based on appellant's being a professional criminal who has devoted his life to committing crimes and appellant's being a dangerous offender whose behavior indicates little regard for human life. *Id.* § 40-35-113(b)(1), (4).

The State argued that the presence of multiple guns during the commission of the offenses and the firing of shots during the escape served to aggravate the offense.

In rendering its decision, the trial court considered the principles and guidelines contained in the Sentencing Act, as well as other appropriate considerations. As to the circumstances of the offenses, the court found that although the jury returned verdicts of guilty as to robbery and attempted robbery, the preponderance of the evidence was that appellant had committed aggravated robberies and an attempted aggravated robbery. The trial court applied the following enhancing factors: (1) that appellant had a previous history of criminal convictions or criminal behavior beyond those necessary to establish the appropriate range of punishment, but gave it little weight because appellant had only one prior felony conviction; (2) that appellant possessed or employed a firearm during the commission of the offense, based on the testimony of Mr. Heard that appellant had possession of a "tech nine" at one point and that there were multiple weapons involved; (3) that appellant had no hesitation about committing a crime when the risk to human life was high, finding that it was not an element of the offense and that guns were used and fired at people; and (4) the felony resulted in death or serious bodily injury or involved the threat of death or serious bodily injury to another person after appellant had been previously convicted of a felony that resulted in death or serious bodily injury, based on appellant's prior conviction of voluntary manslaughter. *Id*. § 40-35-114(1), (9), (10), (11). The court rejected all of appellant's mitigation argument with the exception of his social environment. Accordingly, the trial court set appellant's sentences at the maximum within the ranges, six years for each robbery and four years for attempted robbery.

With regard to consecutive sentencing, the trial court found that appellant was a dangerous offender whose behavior indicated little regard for human life. *Id*. § 40-35-115(b)(4). In support of this factor, the trial court concluded that although the jury returned a verdict of guilty as to robbery, the facts actually established an aggravated robbery. It also noted that shots were fired during the incident, demonstrating appellant's lack of regard for human life. In addition, the trial court determined that confinement for an extended period was necessary to protect society from appellant's unwillingness to lead a productive life and his resorting to criminal activity in furtherance of his anti-social lifestyle and that the aggregate sentence reasonably related to the offenses for which appellant was convicted. As such, it ordered that the two six-year sentences be served consecutively and that the four-year sentence be served concurrently with them, for an effective twelve-year sentence. The trial court denied probation, citing Tennessee Code Annotated section 40-35-103(1)(B), confinement is necessary to avoid depreciating the seriousness of the offense.

Appellant challenges his convictions and sentences in this appeal.

## II. Analysis

### A. Sufficiency of the Evidence

The standard for appellate review of a claim challenging the sufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

To sustain a conviction for robbery as charged in the indictment, the State must have proven beyond a reasonable doubt that appellant committed "intentional or knowing theft of property from" the victim "by violence or putting the [victim] in fear." Tenn. Code Ann.§ 39-13-401.

The evidence at trial, viewed in the light most favorable to the State, established that appellant participated in the robberies of Mr. Albright and Mr. Smith and the attempted robbery of Mr. Brown. He did so by gathering the items from the ground after the victims discarded their belongings. Mapco provided video footage that captured the robberies on tape. Mr. Heard testified that appellant and the unidentified "tall guy" must have entered their vehicle earlier in the night armed with weapons because neither he nor Mr. Askew had weapons in the vehicle prior to their entering it. Mr. Albright positively identified appellant as the person who gathered his belongings during the robbery. Sufficient evidence was presented to establish appellant's guilt on both counts of robbery.

With respect to his conviction for attempted robbery, the State must have proven that appellant intended to commit robbery, that he did some act intending to cause an essential element of robbery to occur, and at the time, appellant believed the act would cause the element to occur without further action on his part. *See* Tenn. Code Ann. § 39-12-101(a)(2). Appellant, while participating in the aforementioned robberies of Mr. Albright and Mr. Smith, acted in concert with his co-defendants when they ordered Mr. Brown to walk away from the gas station window and toward the vehicles. By the jury's verdict of guilty, it accredited the evidence that appellant believed the act of summoning Mr. Brown toward them would cause the robbery of Mr. Brown to occur. Appellant is not entitled to relief on this issue.

Appellant argues that "the testimony of Anthony Heard was self-serving as determined by not only his testimony but also that of witness Fratesi" and that "[h]is placing . . . [a]ppellant as a robber and at the scene was not only part of his desire not to be prosecuted as an adult in this matter but also according to . . . [a]ppellant was part of issues related to other violence committed by Heard against him." Thus, appellant's specific challenge to the sufficiency of the convicting evidence was the credibility and veracity of one of the witnesses against him.

This court has previously stated,

[Appellant's] challenge to the sufficiency of the evidence invites this court to revisit the question of the victim's credibility . . . . Because the resolution of questions of fact, including witness credibility, is within the province of the jury, we must decline the defendant's invitation. By its verdict, the jury accredited the [witness's] testimony despite its sometimes inconsistent nature on particular details.

*State v. Thompson*, 36 S.W.3 102, 107 (Tenn. Crim. App. 2000); *see also State v. Stephens*, 264 S.W.3d 719, 740 (Tenn. Crim. App. 2007) (noting that appellant's challenge to the

-10-

sufficiency of the evidence was based on the credibility of a witness and that this court will not discount the testimony of a witness and engage in a re-weighing or re-evaluation of the evidence on appeal). All witnesses were thoroughly cross-examined, and the jury assessed the testimony and evidence at trial. We will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379. Appellant is not entitled to relief on this claim.

## B. Sentencing

Appellant introduces his argument by stating that "[n]either the sentencing at the high end of the range nor consecutive sentencing were justified by the actual proof at sentencing or derived at trial." However, appellant advances no argument addressing the impropriety of the length of his sentences and includes no references to the record supporting such. He focuses his argument on the trial court's imposing partial consecutive sentences. Pursuant to Tennessee Court of Criminal Appeals Rule 10(b), this court treats as waived those issues that are unsupported by authorities, argument, or references to the record. *See also* Tenn. R. App. P. 27(a)(7)(A). As such, he has waived consideration of the length of his sentences, and we will address sentence alignment only.

In determining an appropriate sentence, a trial court must consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on mitigating and enhancement factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement the defendant makes on his own behalf as to sentencing; and (8) the potential for rehabilitation. Tenn. Code Ann. §§ 40-35-103(5), -113, -210(b); Tenn. Code Ann. § 40-35-114. In addition, "[t]he sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(4).

When an accused challenges the length and manner of service of a sentence, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). If a trial court misapplies an enhancing or mitigating factor in passing sentence, said error will not remove the presumption of reasonableness from its sentencing determination. *Id.* at 709. This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10. Moreover, under such circumstances, appellate courts may not disturb the sentence even if we had

preferred a different result. *See State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401 (2010), Sentencing Comm'n Cmts.; *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

The determination of whether to order consecutive rather than concurrent sentences is a matter primarily within the discretion of the trial court.[1] *See State v. Hastings*, 25 S.W.3d 178, 181 (Tenn. Crim. App. 1999). The procedure is governed by Tennessee Code Annotated section 40-35-115, which lists the factors that are relevant to a trial court's sentencing decision. The court may order consecutive sentences if it finds by a preponderance of the evidence that one or more of the seven statutory criteria exists. Tenn. Code Ann. § 40-35-115(b). Imposition of consecutive sentences must be "justly deserved in relation to the seriousness of the offense." *Id*. § 40-35-102(1). The length of the resulting consecutive sentence must be "no greater than that deserved for the offense committed." *Id.* § 40-35-103(2). In this case, the trial court found that appellant was a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high. *Id.* § 40-35-115(b)(4).

Appellant's sole contention is that the trial court failed to comport with the mandate of *State v. Wilkerson*, 905 S.W.2d 933 (Tenn. 1995), in applying factor (4). Since the supreme court issued the *Bise* and *Caudle* opinions changing the standard of review of sentencing determinations by the trial court to abuse of discretion attributed with a presumption of reasonableness, we question the continued viability of *Wilkerson*. *See Bise*, 380 S.W.3d at 707; *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012); *see also State v. Jereco Tynes*, No. W2010-02511-CCA-R3-CD, 2013 WL 1043202, at *24 n.7 (Tenn. Crim. App. Mar. 13, 2013), *perm. app. denied* (Tenn. June 11, 2013). However, absent clear direction from our supreme court, the current state of the law requires that before a trial court may impose consecutive sentences on the basis of being a "dangerous offender," it must make additional findings that "'an extended sentence is necessary to protect the public' and is 'reasonably related to the severity of the offenses committed.'" *State v. Lane*, 3 S.W.3d 456, 460 (Tenn. 1999) (quoting *Wilkerson*, 905 S.W.2d at 939). The *Wilkerson* considerations only apply to the trial court's finding of factor (4) because "of all of the

---

[1] It is unclear whether the more deferential standard of review of "abuse of discretion with a presumption of reasonableness" announced in *Bise* is applicable to the trial court's determination of sentence alignment. However, our supreme court has granted discretionary review of a case that presents the issue of whether *Bise* governs consecutive sentencing decisions. *See State v. James Allen Pollard*, No. M2011-00332-CCA-R3-CD, 2012 WL 4142253 (Tenn. Crim. App. Sept. 17, 2012)*, perm. app. granted* (Tenn. Feb. 13, 2013).

categories for consecutive sentencing, the dangerous offender category is the most subjective and hardest to apply." *Id.*

In support of this factor, the trial court noted that although the jury returned verdicts of guilty as to robbery, the facts actually established two aggravated robberies. It also noted that shots were fired during the incident, demonstrating appellant's lack of regard for human life. The court further found, pursuant to *Wilkerson*, that confinement for an extended period was necessary to protect society from appellant's unwillingness to lead a productive life and his resort to criminal activity in furtherance of his anti-social lifestyle. *See id.* It also found that the aggregate sentence reasonably related to the offenses for which appellant was convicted. *Id.* The trial court finally noted, "And then if you wanted to add to that the fact that he's killed somebody before, I mean[,] how dangerous does he have to be." The trial court did not err in applying this factor. Appellant is not entitled to relief.

## CONCLUSION

Following our review of the record, the briefs of the parties, and the applicable law, we affirm the judgments of the trial court.

_____
ROGER A. PAGE, JUDGE